IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMARA PETTY, o/b/o T.A.P.N. | ) | CASE NO. 4:21-cv-0033 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE SOLOMON OLIVER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tammara Petty ("Plaintiff" or "Ms. Petty"), on behalf of a minor child, T.A.P.N. ("T.A."), seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying the child's application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider the record as a whole in assessing whether T.A. functionally equals the listings, should accurately discuss the significant probative evidence, should resolve any conflicts in evidence, and should ensure that he builds an accurate and logical bridge between the evidence and the result.

1

## I.  Procedural History

On December 28, 2018, Plaintiff filed an application for SSI on behalf of her grandson, T.A.[1]  (Tr. 149.)  She alleged T.A. had a disability onset date of October 25, 2016.  (*Id*.)  She alleged disability due to developmental delays, behavior issues, emotional problems, laryngomalacia (breathing condition), atopic dermatitis, GERD, blood in stool, excessive sweating, allergic rhinitis, gross motor delay, chronic constipation, and otogenic otalgia of both ears.  (Tr. 162.)  Plaintiff's application on behalf of T.A. was denied at the initial level (Tr. 93) and upon reconsideration (Tr. 101), and she requested a hearing (Tr. 105).  On May 27, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 28-58.)

On June 3, 2020, the ALJ issued a decision finding T.A. had not been under a disability within the meaning of the Social Security Act from December 28, 2018 through the date of the decision.  (Tr. 14-23.)  On November 3, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  On January 7, 2021, Plaintiff filed a Complaint challenging the Commissioner's final decision. (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 16, 18, 19.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

T.A. was born in 2015, making him a preschooler under Social Security Regulations on the date the application was filed.  (Tr. 18.)  T.A. had not worked since December 28, 2018, the application date.  (*Id*.)

---

[1]  The record indicates that Ms. Petty gained custody of T.A. in May 2018.  (Tr. 346.)

**B.      Medical Evidence**

Although the ALJ identified multiple severe physical and mental impairments (Tr. 18) and made findings as to six domains of functioning (Tr. 20-22), T.A.'s challenge in this appeal relates specifically to the ALJ's evaluation of the evidence relating to a single domain: "interacting and relating to others."  (ECF Doc. 16 pp. 1, 10, 12-18.)  The evidence summarized herein is accordingly focused on evidence pertaining to that domain.

**1.      Relevant Treatment History**

On January 8, 2018, a 6-month review from Pennsylvania Early Intervention ("Early Intervention") noted that T.A. had "made fair progress," but continued to be unwilling to eat or try new foods, eating only a few bites before he became distracted.  (Tr. 354.)  Although his vocabulary had "grown significantly," T.A.'s family reported he was difficult to understand by unfamiliar people and became frustrated when others did not understand him. (*Id*.)

During an April 12, 2018 call discussing T.A.'s transition out of Early Intervention, T.A.'s family reported they remained concerned about T.A.'s articulation of words, eating enough calories, and his ability to cooperatively play with peers.  (Tr. 348.)  On May 29, 2018, an Early Intervention service coordinator and physical therapist made a joint home visit to T.A.'s grandmother and guardian, Ms. Petty.  (Tr. 344.)  Ms. Petty reported concerns with T.A.'s aggressive behaviors and refusal to comply with adults.  (*Id*.)

On June 13, 2018, the Pennsylvania Office of Child Development and Early Learning completed an Evaluation Report.  (Tr. 368-72.)  T.A. was two years and seven months old at the time, and had received Early Intervention services for a year, including treatment by an occupational therapist ("OT"), physical therapist ("PT"), speech language pathologist ("SLP"), nutritionist, and special instruction from a visiting teacher.  (Tr. 368, 371.)  Ms. Petty reported

concerns regarding T.A.'s behaviors, eating, speech, and diagnosis of tibial torsion.  (Tr. 371.)
The family reported he was easily distracted during meals and did not eat well, instead drinking
two Pediasure a day.  (Tr. 372.)  They reported T.A. was loving, friendly, and wanted to take
care of people, but frequently said "no" and refused to comply with directions, with larger
reactions including screaming and running off when more people were around.  (*Id.*)  Ms. Petty
reported that T.A. would bang his head on the floor, cry, and hit and kick family members when
frustrated.  (Tr. 372, 378.)  With respect to cognitive development and communication, it was
reported that T.A. used a variety of words, mostly in one-word utterances, and combined
gestures with speech to seek attention and make requests.  (Tr. 377-78.)  He could follow one
step directions if he wanted to, and was able to be comforted by Ms. Petty.  (*Id.*)  With regard to
adaptive development, Ms. Petty reported T.A. did not show awareness of household dangers
such as a hot stove or knife, and did not like a variety of foods because of sensory sensitivities.
(Tr. 381.) Ms. Petty also reported T.A. was disturbed by too much light or touching, did not sit
still, was impulsive, refused to do what he was told, had broken items, bit, kicked, and hit others,
and could not comfort himself when he became upset.  (Tr. 382.)  T.A. was evaluated using the
Battelle Developmental Inventory ("BDI") and scored greater than two standard deviations
below mean in relevant areas, including communication development, adaptive development,
receptive expressive language, and cognitive development.  (Tr. 383.)

On July 10, 2018, T.A. had an initial visit with pediatric gastroenterologist Sapana Shah,
M.D. at Children's Hospital of Pittsburgh.  (Tr. 710.)  Dr. Shah noted T.A. had a history of a
sensory processing disorder, developmental delay, reflux, feeding difficulties, constipation, and
hematochezia (blood in stool).  (*Id.*)  Examination findings were normal except that T.A. was

noted to have delayed verbal development.  (Tr. 712.)  Dr. Shah indicated T.A. was cooperative with the exam and showed appropriate behavior and interaction.  (Tr. 712-13.)

On August 14, 2018, a physical therapist providing Early Intervention therapy in T.A.'s home described T.A. as "very oppositional," including: "banging his head off the floor when he didn't get his way"; throwing things at people; and "demonstrat[ing] sensory seeking behavior like going on the floor."  (Tr. 425.)  Two days later, T.A. "did well" when an occupational therapist encouraged him to touch and mold playdoh to accustom him to unfamiliar textures.  (Tr. 426.)  On August 21, 2018, T. A. greeted his speech and language pathologist happily and "played nicely throughout" their session.  (Tr. 427.)  The following day, his physical therapist again described him as "challenging" and indicated he was "sensory seeking throughout the session" and "throwing himself around."  (Tr. 428.)  The physical therapist noted his "behavior ha[d] worsened over the past month."  (*Id*.)  Ms. Petty reported that T.A. visited the zoo on August 26, 2018, and "had no behaviors at the zoo."  (Tr. 432.)  The following day, he initially did well at his Early Intervention session, but then became distracted with blocks and refused to do anything else.  (*Id*.)  He threw himself on the floor twice that day and was very tired.  (*Id*.)  A nutritionist visited the same day and noted T.A. "has been progressing in all areas of development except eating."  (Tr. 431.)

On September 11, 2018, T.A. reluctantly began a session of physical therapy at his home in an unhappy mood, continued to demonstrate challenging behavior "and thr[ew] himself into people/furniture when sensory seeking."  (Tr. 434.)  Three days later, T.A. greeted his speech language pathologist "happily" and "played nicely throughout," although he "became a little bit active periodically."  (Tr. 435.)  On that same date, T.A. had a follow-up visit with Dr. Shah.

(Tr. 668.)  Examination results were in the normal range except for delayed verbal development. (Tr. 670.)  He was cooperative and demonstrated appropriate behavior and interaction.  (Tr. 671.)

At a physical therapy session on September 18, 2018, the therapist "attempted to give [T.A.] deep pressure input," but he threw himself into furniture and "did not tolerate much handling."  (Tr. 436.)  The same day, T.A. greeted his speech and language pathologist excitedly, "played nicely throughout [the] session," and "was able to use words [and] phrases to meet his needs throughout [the] session."  (Tr. 437.)

When the physical therapist arrived at his home on October 9, 2018, T.A. was "ready to play" and complied with the therapist's instructions every time.  (Tr. 439.)  The next day, T.A. greeted his speech and language pathologist happily, and was "excited to play" and "extremely active."  (Tr. 440.)  At an October 16, 2018 physical therapy session, T.A. was "in a good mood," was able to remain seated, and tolerated being stretched and re-postured "fairly well," but the therapist noted he continued to crash into things for sensory input.  (Tr. 441.)

Classroom notes from an occupational therapist and speech and language pathologist who worked with T.A. in his preschool classroom in November 2018 describe him as doing well, being a pleasure to work with, completing table time work accurately, declining non-preferred tasks politely with the phrase "no thank you," and using "lengthy phrases to comment, request, protest and gain attention."  (Tr. 442-43.)

On January 9, 2019, T.A. returned to Dr. Shah for a follow up appointment.  (Tr. 513.) Dr. Shah noted T.A. "continues to have feeding difficulties which they think are secondary to his sensory disorder."  (*Id*.)  Physical examination results were in the normal range, and T.A. demonstrated appropriate behavior and interaction.  (Tr. 515.)

### 2. Opinion Evidence

#### i. Treating Psychological Evaluations

On August 29, 2018, Virginia Martin, Psy.D., performed a psychological evaluation of

T.A.  (Tr. 302-07.)  Dr. Martin noted T.A.'s family reported significant emotional and behavioral

concerns, including switching moods quickly and engaging in tantrum behavior where he would

"bang his head, growl, cry, tense his body/shake, screams, his eyes roll back, he turns his head

away, hits, bites, scratches, and punches."  (Tr. 302.)  On the Child Behavior checklist, based on

responses from Ms. Petty, T.A. was clinical (most severe) in the following: emotionally reactive;

anxiety/depression; somatic complaints; withdrawn; sleep disturbance; attention problems;

aggressive behavior; depressive problems; autism spectrum disorder; and oppositional defiance

disorder ("ODD").  (Tr. 305.)

Results on the Caregiver-Teacher Report Form were as follows, based on the responses

of physical therapist Lindsay Royal, PT DPT, occupational therapist Amanda Ransom, MS,

OTR/L, and developmental therapist Christy Miller, MS.Ed.:

- In the categories Emotionally Reactive, Aggressive Behavior, and Oppositional Defiant Disorder, T.A. was identified as "clinical" based on the responses of his physical therapist and "borderline" from the responses of his occupational and developmental therapists.

- In the categories Anxiety/Depression, Somatic Complaints, Anxiety Problems, he was identified as "clinical" based on the responses of his physical and occupational therapists, but "typical" from the responses of his developmental therapist.

- In the category Autism Spectrum Disorder, he was identified as "clinical" based on the responses of his physical therapist, "borderline" from the responses of his occupational therapist, and "typical" from his developmental therapist.

- In the categories Attention Problems and ADHD, he was classified as "clinical" based on the responses of his physical therapist, but "typical" from the responses of his occupational and developmental therapists.

7

(*Id.*)  All three therapists reported concern with emotional reactivity, aggression, and symptoms of ODD, and endorsed the following as very/often true: can't stand waiting/wants everything now, demands must be met immediately, easily frustrated, explosive and unpredictable behavior, inattentive, sudden changes in mood, and wants a lot of attention.  (*Id.*)  On the Temperament and Atypical Behavior Scale (TABS), both Ms. Petty and the DT Miller endorsed significant symptoms in the hyper-sensitive/active domain.  (*Id.*)

Based upon the Autism Diagnostic Observation Schedule (ADOS-2), Dr. Martin concluded T.A. did not meet diagnostic criteria for Autism Spectrum Disorder ("ASD").  (*Id.*)  On the Developmental Assessment of Young Children (DAYC-2), T.A. scored within the average range in every area except social-emotional, in which he scored below average.  (Tr. 306.)  Dr. Martin diagnosed ODD and Unspecified Anxiety Disorder, and concluded that T.A.'s behavioral and emotional needs were "significant" and impacted "his daily life and the daily functioning of his family."  (Tr. 307.)  Because T.A. was in need of "additional, intensive behavioral support to better manage his emotional and behavioral needs," Dr. Martin prescribed Behavioral Health Rehabilitation Services, and recommended Parent Child Interaction Therapy and continued receipt of Early Intervention therapies already in place.  (*Id.*)

On November 13, 2019, Dr. Martin completed a second evaluation, noting T.A. had begun attending preschool, and indicating the reevaluation was based on "continued concerns at home and school with [T.A.'s] behavior and social skills."  (Tr. 599.)  Dr. Martin noted that T.A.'s family reported tantrums and episodes of intense aggression, as well as manipulative, restless, and impulsive behavior.  (*Id.*)  Preschool staff reported that T.A. displayed similar behaviors, including resistance/defiance, aggression, difficulty maintaining personal space and keeping his hands to himself, and "acting like a little adult."  (Tr. 600.)

Ms. Petty completed a new Child Behavior Checklist with similar clinical findings to the prior evaluation. (Tr. 601.) Results on the Caregiver-Teacher Report Form were as follows, based on the responses of classroom teachers Arianna Wilson and Ellen Spano, speech/language pathologist Katherine Morrow, and occupational therapist Cynthia Hoppert:

- In the categories Anxiety Problems and Oppositional Defiant Disorder, T.A. was identified as "clinical" based on the responses of both teachers and SLP Morrow, but as typical based on OT Hoppert's responses.

- In the categories Anxiety/Depression, Aggressive Behavior, and Autism Spectrum Disorder, T.A. was identified as "clinical" based on the responses of teacher Spano and SLP Morrow, as "borderline" from the responses of teacher Wilson, and as typical based on OT Hoppert's responses.

- In the category Emotionally Reactive, T.A. was identified as "clinical" based on the responses of teacher Spano and SLP Morrow, as "borderline" from the responses of OT Hoppert, and as typical based on teacher Wilson's responses.

- In the categories Withdrawn and Depressive Problems, T.A. was identified as "clinical" based on the responses of teacher Spano and SLP Morrow, but as typical based on the responses of teacher Wilson and OT Hoppert.

- In the categories Attention Problems and ADHD, T.A. was identified as "clinical" based on the responses of teacher Spano, but typical based on all other responses.

- In the category Somatic Complaints, T.A. was identified as "borderline" based on the responses of teacher Spano, but typical based on all other responses.

(Tr. 602.) Results of the Preschool and Kindergarten Behavior Scales were as follows, based on the responses of Ms. Petty, teachers Wilson and Spano, SLP Morrow, and OT Hoppert:

- In the category Externalizing Problems, T.A. was identified as moderate or high risk based on the responses of all participants.

- In the categories Social Cooperation and Social Independence, T.A. was identified as moderate or high risk based the responses of all participants, except OT Hoppert.

- In the categories Social Interaction and Internalizing Problems, T.A. was identified as moderate or high risk based on the responses of Ms. Petty, teacher Spano, and SLP Morrow, but as typical risk by teacher Wilson and OT Hoppert

(*Id.*)

Based on the ADOS-2, a diagnostic tool for ASD, Dr. Martin found T.A. showed appropriate speech patterns but poor intelligibility at times, no atypical language, ability to engage in limited conversational exchange, appropriate eye contact, occasional facial expressions to show mood but did not demonstrate facial expressions when asked to do so, showed some shared enjoyment during activities but often refused tasks or was avoidant in the activities which affected the social dynamic, demonstrated limited play skills but did engage in structured pretend play, did not display atypical sensory behavior but became fixated with a toy and was particular about orienting wooden blocks.  (Tr. 603.)  Based on these findings, Dr. Martin found T.A. met the criteria for ASD.  (*Id.*)  Most of T.A.'s scores under the DAYC-2 were in the average range, except that he was rated as below average in Gross Motor and Adaptive Skills and "poor" in the Social-Emotional subtest.  (*Id.*)  Dr. Martin diagnosed ASD, ADHD, ODD, and anxiety disorder, prescribed Applied Behavior Analysis services and a "therapeutic social skills group to address his social needs regarding social/pragmatic language, social interaction, problem solving, and friendship development," and instructed that T.A. continue existing therapies and be evaluated for outpatient speech and occupational therapy.  (Tr. 604.)

### ii.      Consultative Examination

On April 16, 2019, pediatric psychologist David L. Chiarella, Ph.D., conducted a consultative psychological evaluation of T.A. at the request of the state agency, consisting of a clinical interview and review of documents that included Dr. Martin's August 2018 evaluation. (Tr. 475-78.)  Dr. Chiarella noted T.A. exhibited a heightened degree of physical activity throughout the interview process.  (Tr. 476.)  Dr. Chiarella also observed T.A. was attached to his grandmother, his speech was difficult to understand, he responded only to some questions and with limited responses, he did not play with toys except for his iPad, and when on the iPad he was quiet and did not move.  (Tr. 477.)  Dr. Chiarella opined T.A. was "limited" in both

attention and concentration and his ability to persist in goal-directed activities.  (Tr. 478.)  Dr. Chiarella diagnosed ODD and unspecified Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id*.)

### iii.    IEP Reports

In his March 11, 2019 Individualized Education Plan ("IEP"), T.A. was found eligible for continued speech, occupational, and physical therapy services.  (Tr. 575-77, 586.)  With respect to communication, the IEP team noted that T.A. did not interact with his peers or communicate his wants or needs at school, and had difficulty using language as a thinking tool.  (Tr. 580.) While he displayed receptive language skills, he was noted to be "an observer in the classroom," who "prefer[ed] to watch what [wa]s going on in the classroom and mostly require[d] adult assistance to participate in interactive tasks."  (Tr. 576.)  He was shy but cooperative and seemed to enjoy spending time with the adults at school.  (*Id*.)  To improve his communication skills, the team found that T.A. needed "direct instruction that incorporates high levels of encouragement, repeated practice, corrective feedback, demonstration, models, cues, and prompts to build his language skills."  (Tr. 577.)

With respect to social and emotional skills, the IEP team noted that T.A. often preferred to interact with the adults in his classroom rather than the children and would not engage in activities for a developmentally appropriate period of time "without direct adult involvement." (Tr. 584.)  He needed occasional reminders regarding routines, often needed redirecting back to activities and preferred direct adult assistance, participated in classroom activities with prompting, used self-help skills with occasional reminders, used materials in appropriate ways, and followed classroom rules.  (Tr. 577.)  He also had "difficulty working/playing with other children," often preferring to observe peers, and needing "adult modeling and guidance on

11

interacting and engaging in play with others." (*Id.*)  To improve these skills, the team found T.A. could benefit from "a social/emotional goal with direct instruction, practice, and modeling to increase his social interactions with others as well as his independence in completion of tasks of his own choosing." (*Id.*)

In his March 3, 2020 IEP, T.A. was found eligible for continued speech and occupational therapy, as well as additional specially designed instruction in the classroom.  (Tr. 772-74, 783-84.) With respect to communication, he was noted to exhibit pronoun errors and multiple sound substitutions, phonological deviations with the potential not only to interfere with his ability to communicate, but could also negatively impact literacy.  (Tr. 776.)  The IEP team observed that he was participating more in the classroom, and would "sometimes participate in a structured, adult led play activity with one or more peers."  (Tr. 772.)  While he was "more frequently attempting to engage in play with peers," that play was noted to be "on his own terms," where he exhibited problems playing cooperatively and became noncompliant, obstinate, aggressive, or "very oppositional" when adults intervened to encourage appropriate peer interactions or "when things d[id] not go his way."  (*Id.*)  The team found he would benefit from "specially designed instruction that focuses on modeling, repetition, and corrective feedback."  (*Id.*)

With respect to social/emotional skills, the IEP team noted that he was inconsistent in his displays of emotions and self-regulation, sometimes demonstrating an ability to state how he felt and appropriately self-regulate, but other times crying, screaming, becoming aggressive, and being unable to independently self-regulate.  (Tr. 778.)  The team further noted that he often refused to comply when presented with a non-preferred task.  (Tr. 779.)  The team explained that he had "unpredictable triggers," so that he would sometimes be "nice, helpful, and cooperative," but other times "oppositional, defiant, argumentative, and aggressive."  (Tr. 773.)  He sometimes

12

showed limited interest in peers, and other times asked them for hugs, shared, and was talkative
to them.  (*Id.*)  He showed "inconsistent empathy and awareness of other people," sometimes
being loving or comforting peers, but other times "taking their toys on purpose, pulling their hair,
getting in their face, being aggressive, etc."  (*Id.*)  Observed aggressive tendencies included
"hitting, pushing, kicking, and yelling – with attempts to argue with others."  (*Id.*)  The team
found he would benefit from "specially designed instruction targeting compliance to adult
directives, consistent appropriate displays of emotions, and playing with peers," as well as "adult
modeling, social stories, visuals, repeated directives, and praise when he is successful."  (*Id.*)

### iv.    Teacher Questionnaire

On February 28, 2020, T.A.'s special education Pre-K teachers Arianna Wilson and Ellen
Spano jointly completed a Teacher Questionnaire at the request of the state agency.  (Tr. 763.)
They indicated that they had known T.A. for 13 months, since he began preschool in January
2020.  (*Id.*)  With respect to acquiring and using information, his teachers indicated that they did
not believe he had "any issue in the cognitive domain or academic skills," but noted that he
"often refuse[d] to display or articulate the knowledge he has" and needed support "behaviorally
to assist in him following through and being compliant to the directions and perspectives of
others."  (Tr. 764.)  With respect to attending and completing tasks, he was rated as having no
more than an obvious problem in any area, but his teachers noted that he "often exhibit[ed]
defiant and uncooperative behavior" and "often d[id] not prefer to listen to adult directives unless
it [wa]s on his terms," which "interfere[d] with his ability to carry out directions, not be
disruptive, finish work, etc."  (Tr. 765.)

In interacting and relating to others, T.A.'s teachers stated that he had "a very serious
problem" in expressing anger appropriately and respecting/obeying adults in authority, as well as

13

"a serious problem" in playing cooperatively with other children and making and keeping friends. (Tr.766.) Related behavior modification strategies included removal from specific areas of the classroom, Crisis Prevention Institute ("CPI") holds, and social/emotional interventions. (*Id.*) His teachers further explained that he needed "significant support in this area," and could not "maintain positive relations to others as well as managing his emotions in a safe and age-appropriate manner." (*Id*.) While a familiar listener would be able to understand "almost all" of his speech when the topic of conversation was known, T.A.'s teachers opined that the listener would understand 1/2 to 2/3 of his speech when the topic was unknown. (Tr. 767.)

In caring for himself, T.A.'s teachers indicated that he had "a very serious problem" in handling frustration appropriately, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and using appropriate coping skills to meet daily demands of the school environment. (Tr. 768.) They explained: "When dysregulated, he cries, screams, hurts himself, and at times has attempted to hurt others and the environment around him." (*Id.*) Although he was sometimes able to self-regulate, at other times he was "explosive, violent, and inconsolable." (*Id.*) In conclusion, T.A.'s teachers noted that he showed "significant needs in mental health" which were "impacting other areas of his development," and also indicated that he required speech and language therapy to assist in unfamiliar people being able to understand him. (Tr. 769.)

### v. State Agency Reviewers

In May 2019, State Agency Psychologist Dr. Vicki Warren and State Agency Pediatrician Dr. Louis Goorey reviewed the record and opined that T.A. had marked limitations in attending and completing tasks, less than marked limitations in acquiring and using information, interacting and relating to others, caring for himself, and health and physical wellbeing, and no

limitations in moving about and manipulating objects.  (Tr. 68-70.)  In October 2019, State Agency Psychologist Dr. David Dietz and State Agency Pediatrician Dr. Bruce Mervis reviewed the record and concurred with their colleagues.  (Tr. 86-87.)

## C.  Hearing Testimony

At the May 27, 2020 hearing, Ms. Petty testified that T.A. was four years old and lived with her and her husband, as well as T.A.'s aunt.  (Tr. 37.)  T.A. had lived with her since he was nine or ten months old, and she received official custody of him in May 2017.  (*Id*.)  T.A. could be very aggressive and intimidating towards his aunt and grandfather.  (Tr. 38.)

With regard to communication, T.A.'s could be hard to understand, especially when he was upset, and Ms. Petty functioned as his interpreter.  (Tr. 39.)  He didn't know how to engage with other kids, and didn't interact with the other kids at school.  (Tr. 44, 48.)  He had outbursts of violent oppositional behavior at school and at home once or twice a month.  (Tr. 49-50.)  He was rarely violent towards Ms. Petty, which she believed was because she knew his triggers and could see when an outburst was coming and keep it to more of a minimum.  (Tr. 50.)

Since he was little, T.A. has disliked textures on and in his mouth.  (Tr. 42.)  He primarily ate Pediasure, macaroni and cheese, toast with cream cheese, and chicken.  (*Id*.)  He had gone days without eating and been unbothered.  (*Id*.)

## III. Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 1382c(a)(3)(C)(i).  To qualify, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequentia0l process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, 0a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disabilit0y will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a).  Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

### IV. The ALJ's Decision

In his June 3, 2020 decision, the ALJ made the following findings:[2]

---

[2] The ALJ's findings are summarized.

1.  The claimant was born in 2015. Therefore, he was a preschooler on December 28, 2018, the date application was filed, and is currently a preschooler. (Tr. 18.)

2.  The claimant has not engaged in substantial gainful activity since December 28, 2018, the application date. (*Id*.)

3.  The claimant has the following severe impairments: tibial torsion, laryngomalacia with dysphagia and cough, gastro-esophageal reflux disease (GERD)/constipation with blood in stool, asthma, anxiety disorder, oppositional defiant disorder (ODD), autism spectrum disorder, attention deficit hyperactivity disorder (ADHD) and speech and language delay. (*Id*.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.)

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 19.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 28, 2018 through the date of the decision on June 8, 2020. (Tr. 23.)

## V. Plaintiff's Arguments

In her brief, Ms. Petty makes a single assignment of error:

1.  The ALJ's functional equivalence finding was the product of legal error and was not supported by substantial evidence as Claimant should have been found to have a marked limitation in interacting and relating to others as supported by the record and opinion evidence. (ECF Doc. 16. p. 3.)

## VI. Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v.*

*Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654

("Generally, … we review decisions of administrative agencies for harmless error.").  A decision

will also not be upheld where the Commissioner's reasoning does not "build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875,

877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **Assignment of Error: Whether ALJ Erred in Finding T.A.'s Combination of Impairments Did Not Functionally Equal the Severity of the Listings**

In her sole assignment of error, Ms. Petty asserts that "the ALJ erred in failing to find

[T.A.] has at least a marked limitation in interacting and relating to others," after having failed

"to properly evaluate the opinion evidence and documented evidence of record."  (ECF Doc. 16

p. 14.)  The Commissioner argues "the ALJ appropriately found that the child had a less than

marked limitation in the domain of interacting and relating to others" because T.A.'s "relevant

standardized test scores were less than two standard deviations from the mean during the relevant

period" and the ALJ "cited ample evidence confirming that T.A.'s interacting and relating to

others was not 'far below' what the non-marked scores would predict."  (ECF Doc. 18 p. 10-12.)

**1.**    **Governing Regulatory Standards**

To support a Step Three determination that a child functionally equals a listing, the ALJ

must find his impairments are "of listing-level severity," meaning they will "result in 'marked'

limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. §

416.926a(a).  Under Social Security regulations, a limitation is "marked" if the impairment

"interferes seriously with [the child's] ability to independently initiate, sustain, or complete

activities." 20 C.F.R. § 416.926a(e)(2)(i).  Marked limitations are also described as limitations

that are "'more than moderate' but 'less than extreme'" and "the equivalent of the functioning

[the SSA] would expect to find on standardized testing with scores that are at least two, but less

than three standard deviations below the mean."  *Id.*

Despite the reference to standardized test scores, the regulations specify that the ALJ

"will not rely on any test score alone" as "[n]o single piece of information taken in isolation can

establish whether" a child has a marked limitation.  20 C.F.R. § 416.926a(e)(4)(i).  Instead, test

scores are considered with other information about the claimant's functioning, "including reports

of classroom performance and the observations of school personnel and others."  20 C.F.R. §

416.926a(e)(4)(ii).  For example, where standardized test scores are "slightly higher" than two

standard deviations below the mean, a marked limitation may be found where "functioning in

day-to-day activities is seriously or very seriously limited" because of the child's impairments,

including where evidence shows the impairments cause the child to function "in school, home,

and the community far below [his] expected level of functioning based on [the test] score."  20

C.F.R. § 416.926a(e)(4)(ii)(A).

Here, the ALJ found that T.A. has a "marked" limitation in the domain of attending and

completing tasks (Tr. 19), which was not challenged on appeal (ECF Doc. 16 p. 14).  Ms. Petty

argues that T.A. is entitled to benefits under the functional equivalence standard because the ALJ

should also have found that T.A. had a "marked" limitation in the domain of interacting and

relating to others.  (*Id.*)  That domain concerns how well a child is able to initiate and sustain

emotional connections with others, develop and use the language of his community, cooperate

with others, comply with rules, respond to criticism, and respect and take care of the possessions

of others. 20 C.F.R. § 416.926a(i).

The ALJ found a "less than marked" limitation in this domain, explaining:

> As noted, the claimant was diagnosed with ODD, anxiety disorder, and autism spectrum disorder, and his grandmother testified that he experiences many oppositional issues at school and home, including a history of destroying a classroom, scratching his teacher, and attacking other people 15 to 20 times at home or school, while his behavior is becoming worse as he gets old (hearing testimony). However, the claimant's grandmother told Dr. Chiarella that while he demonstrated significant oppositional and defiant behaviors at home, he did not demonstrate any at preschool or when interacting with his peers (Exhibit 12F, pg. 4). Moreover, Dr. Chiarella noted that upon mental status examination, the claimant presented with a positive physical appearance, was socially responsive, and responded to some of his questions with limited details (Exhibit 12F, pg. 2-3).

(Tr. 21.) Ms. Petty argues that this finding was in error because "the ALJ essentially used the findings of Dr. Chiarella's examination, at the exclusion of the entire record, to find [T.A.] had less than marked limitations in interacting and relating to others," and because the ALJ mischaracterized Dr. Chiarella's report, which "really shows significant problems in interacting and relating to others." (ECF Doc. 16 pp. 16-17.)

The Commissioner responds that the evidence supported the ALJ's "less than marked" findings, especially the standardized test scores during the relevant period. (ECF Doc. 18 p. 10.) She argues further that it is "demonstrably false" that the ALJ relied solely on Dr. Chiarella's report, as he also found the opinions of the state agency consultants "persuasive" and noted their consistency with the evidence at large, and thus "necessarily considered" that evidence. (*Id.* at p. 14 (citing Tr. 26).) The ALJ's findings regarding the state agency opinions were as follows:

> I find the State Agency Childhood Disability Evaluation Forms persuasive, who concluded that the claimant does not meet or equal any listing, and has the same level of limitations in the six domains of function as those adopted above (Exhibit 1A; 3A). These opinions are generally consistent with the claimant's medical/school records and treatment history. Additionally, the DDS consultants thoroughly reviewed the medical record and they are experts regarding Social Security Disability evaluation.

(Tr. 26.) Ms. Petty responds that the ALJ's analysis of the state agency opinions "[i]s largely boilerplate, and offers no explanation whatsoever as to how these opinions were found more

21

persuasive in the particular domain of interacting and relating to others," and argues: "This is a tiny seven-page ALJ decision, and when specifically talking about the important domain of interacting and relating to others, the ALJ only discusses Dr. Chiarella." (ECF Doc. 19 p. 3.)

The question presented on appeal is whether the ALJ's finding that T.A.'s limitations in interacting and relating to others were "less than marked" was supported by substantial evidence, and more specifically whether the ALJ mischaracterized or improperly omitted evidence in support of the challenged finding. (*See* ECF Doc. 16 p. 16 (citing cases).)

### 2. Whether ALJ Finding Was Supported by Substantial Evidence

Although the substantial evidence standard is largely deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir. 1984)). The court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history." *Rogers,* 486 F.3d at 249.

Thus, even though the standard does not set a high bar, it does require discussion of the significant probative evidence. *See, e.g., Saez v. Colvin*, 216 F. Supp. 3d 497, 511 (M.D. Pa. 2016) ("[I]t is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, 'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'") (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979)); *Jean V. v. Saul*, No. 1:19-CV-00240-REB, 2021 WL 1220619, at *7 (D. Idaho Mar. 31, 2021) ("More fundamentally, and as a

separate instance of error, the ALJ's decision is not supported by substantial evidence in that it fails to discuss significant probative evidence. … It is not the ALJ's duty to discuss every piece of evidence in the record – even every relevant piece of evidence. But it is the ALJ's duty to support his decision with record evidence, and he did not do so adequately here.").

In analyzing the entire record, the ALJ also has a responsibility to acknowledge and resolve conflicts in evidence.  *See Richardson v. Perales,* 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").  Moreover, it is well-settled that an "ALJ may not pick and choose, without a good medical or other reason for doing so, those limited aspects of the record that he or she chooses, while rejecting other aspects of the record without an identifiable basis for doing so." *Jones v. Comm'r of Soc. Sec.*, No. 3:13-CV-019, 2014 WL 340427, at *4 (S.D. Ohio Jan. 30, 2014), *report and recommendation adopted in part, rejected in part*, 2014 WL 1050042 (S.D. Ohio Mar. 17, 2014).

Indeed, where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, courts have routinely held that the ALJ erred by failing to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL

23

2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

In this case, the undersigned observes that the underlying ALJ decision limits the discussion of T.A.'s medical and school records – numbering over 500 pages – to minimal citations in support of the ALJ's functional equivalence and opinion findings, all of which totals two pages.  (Tr. 25-26.)  That limited analysis lacks any substantive discussion of T.A.'s early intervention treatments and findings throughout 2018, as well as his IEP findings and interventions in 2019 and 2020.  The ALJ's discussion of Dr. Martin's psychological evaluation findings in 2018 and 2019 was summary and cursory.  And the ALJ's discussion of the questionnaire responses of T.A.'s teachers in 2020 was selective, leaving out significant findings and opinions that were relevant to the analysis challenged in this appeal.

In support of the specific finding challenged in this appeal – that T.A. had "less than marked" limitations in interacting and relating to others – the Commissioner has identified two portions of the decision as demonstrative of the ALJ's analysis.  First, in direct explanation for his finding, the ALJ acknowledged T.A.'s diagnoses and Ms. Petty's May 2020 testimony that he demonstrated oppositional issues at school and home (Tr. 25 (citing hearing testimony)), but contrasted this evidence with her report to consultative examiner Dr. Chiarella in April 2019 that T.A. did not have problems interacting with his school mates or teachers (*id.* (citing Tr. 478)) and Dr. Chiarella's observations on examination that T.A. "presented with a positive physical appearance, was socially responsive, and responded to some of his questions with limited details" (*id* (citing Tr. 476-77).  Second, in opinion findings cited as reflective of additional evidence considered by the ALJ in support of his finding, the ALJ found the opinions of the state

agency consultants persuasive as "generally consistent with [T.A.]'s medical/school records and treatment history" and based on a thorough review of the medical record. (Tr. 22.)

The undersigned must thus consider, in the context of the ALJ's minimalist discussion of the record as a whole, whether it was sufficient that the ALJ cited to hearing testimony and the consultative examination in support of his "less than marked" finding (Tr. 25), supplemented by a generalized finding that the state agency consultant opinions were consistent with the record (Tr. 26). Even if this Court were to conclude, as the Commissioner suggests, that the ALJ considered every document reviewed by the state agency consultants, and found their opinions regarding that evidence persuasive, the ALJ's analysis would nevertheless remain necessarily limited to those records in evidence as of October 2019, when the final state agency consultant opinion was provided. (Tr. 69-70, 86-87, 475-78.)

The evidence post-dating the final state agency consultants' review in October 2019 included Dr. Martin's November 2019 psychiatric evaluation (Tr. 599-604), the February 2020 teacher questionnaires (Tr. 763-69), and T.A.'s March 2020 IEP (Tr. 772-79). This is of particular import because the "less than marked" finding at issue was specifically premised on the noted fact that Ms. Petty's May 2020 testimony regarding T.A.'s reportedly worsening behavior issues was not consistent with her report to the consultative examiner in April 2019 that T.A. did not demonstrate significant oppositional or defiant behaviors at school. (Tr. 25 (citing Tr. 478).) Each of the above documents was prepared and entered into evidence after the state agency opinions were complete, and each contained probative evidence supportive of Ms. Petty's May 2020 testimony regarding worsening behavior, and suggestive of material changes since her contrary report to the consultative examiner over a year prior. More detailed findings in these

more recent records are set forth in Section II.B., *supra*, but specific examples pertinent to this discussion are identified below.

First, in Dr. Miller's November 2019 psychiatric evaluation, notable elements included: (1) reports by both Ms. Petty and preschool staff that T.A. displayed defiance, tantrums, aggressive behavior, and difficulty maintaining personal space (Tr. 599-600); (2) observations by classroom teachers and a speech language pathologist that suggested "clinical" or "borderline" issues in numerous categories, as well as moderate or high-risk behavior (Tr. 602); (3) a new diagnosis of ASD by Dr. Martin based on objective findings relating to his observed social interaction behaviors (Tr. 603); (4) a "poor" rating on the social-emotional subtest for DAYC-2 (*id.*); and (5) new prescribed therapies relating to behavior and social skills (Tr. 604).

In the February 2020 teacher questionnaire, issues noted by T.A.'s special education classroom teachers included: (1) frequent refusal to articulate and a need for behavioral assistance to comply with "directions and perspectives of others" (Tr. 764); (2) "very serious" problems in expressing anger and respecting/obeying adults, and "serious" problems in playing cooperatively with other children and making/keeping friends (Tr. 766); (3) "very serious" problems in handling frustration, asserting emotional needs, responding to mood changes, and using coping skills, with reports that he cried, screamed, hurt himself, attempted to hurt others and the environment, and was at times "explosive, violent, and inconsolable" (Tr. 768); and (4) "significant" mental health needs that impacted other areas of development (Tr. 769).

In the March 2020 IEP, notable elements included: (1) increasing attempts to engage with peers, but "on his own terms" with noted problems playing cooperatively and becoming noncompliant, obstinate, aggressive, or "very oppositional" when adults intervened or things did not go his way (Tr. 772); (2) inconsistent displays of emotion and self-regulation, where he

sometimes cried, screamed, or became aggressive (Tr. 778); (3) unpredictable triggers that led him sometimes to be "oppositional, defiant, argumentative, and aggressive" (Tr. 773); (4) inconsistent empathy and awareness of other people that led him to sometimes take other students' toys, pull their hair, get in their faces, and be aggressive, with aggressive tendencies that included "hitting, pushing, kicking, and yelling" (*id.*); and (5) recommendations for specially designed instruction and modeling to address these behavior issues (Tr. 772-73).

None of the evidence outlined above was discussed in connection with the ALJ's finding the T.A. had "less than marked" limitations in the domain of interacting and relating to others, and none was considered by the state agency consultants. (Tr. 25.) While certain findings in the teacher questionnaire were discussed in support of the determination that T.A. had "marked" limitations in attending and completing tasks (*id.* (citing Tr. 765)), that fact only makes it more notable that the significant questionnaire findings regarding T.A.'s ability to interact and relate to others were not discussed. The only arguable discussion of the above IEP and other teacher questionnaire findings took the form of a string citation to eight different exhibits, with a combined page count of over 250 pages, followed by a broad observation that the findings were "mostly consistent" with the ALJ's own findings, but "at times overstated [T.A.]'s limitations in certain domains." (Tr. 26.)

The ALJ did briefly discuss Dr. Martin's evaluations, and acknowledge that Dr. Martin found T.A. needed certain therapies and had "behavior issues such as becoming increasingly aggressive and self-injurious, experience[d] quick changes in his moods, and also experience[d] inattention and hyperactivity issues." (Tr. 26.) But he concluded broadly that Dr. Martin's opinions were "mostly consistent with the record as a whole as discussed above." (*Id.*) This conclusion was at odds with the ALJ's prior analysis of the "interacting and relating with others"

domain, where he had undermined Ms. Petty's reports of oppositional behavior at school by highlighting her earlier report to the consultative examiner that T.A. was doing well at school. (Tr. 25.) The ALJ did not reference Dr. Martin's findings in that discussion, despite the fact that those findings supported Ms. Petty's testimony regarding worsening behavior. Further, while the ALJ focused on the form of Dr. Martin's report – explaining it was partially persuasive because it was "not focused on the six domains of function" – he failed to acknowledge content in the report which was specifically relevant to the functional domains. (Tr. 22.)

It is noted that the Commissioner has offered a detailed analysis of test scores and other objective findings that might be supportive of the ALJ's conclusions. (ECF 18 pp. 10-12.) Nevertheless, the fact remains that the test scores were neither identified nor discussed in the ALJ decision. As prior courts have explained "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration." *Gearing v. Comm'r of Soc. Sec.*, 417 F. Supp. 3d 928, 949 (N.D. Ohio 2019) (citing cases); *see also Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) ("[T]his Court shall not 'accept post hoc rationalizations for agency action in lieu of [accurate] reasons and findings enunciated by the Board.'") (*quoting Hyatt Corp. v. N.L.R.B.,* 939 F.2d 361, 367 (6th Cir. 1991). Because the arguments now advanced by the Commissioner were not first articulated by the ALJ, they are rejected as *post hoc* rationalizations. Indeed, the detailed analysis in the briefing only serves to emphasize the inadequacy of the discussion and analysis contained in the underlying decision.

For all of the reasons set forth above, the undersigned finds that the ALJ's brief analysis of the record evidence is too limited to support a conclusion that he considered the record as a whole. Further, the undersigned finds that the limited evidence selected for discussion amounted

to a mischaracterization of the records because it neglected to acknowledge material conflicting evidence that deprived the decision of an "accurate and logical bridge" between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  The undersigned accordingly concludes that the ALJ decision lacked substantial evidence to support the functional equivalence finding, and recommends that the decision be remanded for further proceedings.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider the record as a whole in assessing whether T.A. functionally equals the listings, should accurately discuss the significant probative evidence, should resolve any conflicts in evidence, and should ensure that he builds an accurate and logical bridge between the evidence and the result.

*/s/Amanda M. Knapp*

April 20, 2022

AMANDA M. KNAPP
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).